J-S23029-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.J.P., A MINER | : IN THE SUPERIOR COURT OF<br>:     PENNSYLVANIA<br>:<br>: |
| APPEAL OF: M.F., FATHER | :<br>:<br>:<br>:<br>:<br>: |
| | : No. 358 EDA 2025 |

Appeal from the Decree Entered January 7, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000415-2024,
CP-51-AP-0000415-2024

BEFORE:  STABILE, J., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.:                          **FILED JULY 14, 2025**

M.F. (Father) appeals from the decree granting the petition filed by the Philadelphia Department of Human Services (DHS) and involuntarily terminating his parental rights to M.J.P., a son born in March 2023 (Child).[1] After careful consideration, we affirm.

The family came to DHS's attention in March 2023, following a report that, at the time of Child's birth, he was underweight and placed in the neonatal intensive care unit of Cooper Medical Center in Camden, New Jersey. The report further alleged that Mother suffered from anxiety and depression,

_____

[1] On October 24, 2024, Child's mother, S.P. (Mother), and DHS jointly filed a petition for voluntary relinquishment of Mother's parental rights to Child.  *See* Petition, 10/24/24.  On January 7, 2025, the trial court terminated Mother's parental rights.  Mother has not separately appealed and is not a party to the instant appeal.

and it was unknown whether Mother was receiving mental health treatment. Father's whereabout were unknown to DHS.[2]

On April 12, 2023, DHS filed a dependency petition. The juvenile court[3] granted the petition on May 4, 2023, committed Child to DHS's care, and directed that Child be placed in the home of J.P. and A.S. (foster parents).[4] The juvenile court held a permanency review hearing on July 24, 2023, which Father did not attend.[5] At that hearing, the juvenile court appointed Father counsel, and directed Father to contact the Community Umbrella Agency[6]

_____

[2] Discussed further *infra*, Mother advised DHS that Father was incarcerated at the onset of the case. N.T., 1/7/25, at 29, 30-31. DHS was unable to locate Father. Father later testified at the termination of parental rights (TPR) hearing that he was incarcerated from November 22 to December 18, 2023. *Id.* at 81-82.

[3] The Honorable Brian McLaughlin presided over both the dependency and termination proceedings.

[4] The dependency docket, entered into evidence at the TPR hearing as DHS Exhibit 4 (Exhibit 4), identifies J.P. as Child's maternal aunt. Since the inception of this case, Child has remained in the care of foster parents, who are preadoptive resources. N.T., 1/7/25, at 45; Juvenile Court Opinion, 4/8/25, at 16.

[5] We are unable to glean from the certified record whether Father was served notice of the July 2023 hearing. However, Exhibit 4 discloses that, following the appointment of Father's counsel, counsel received notice of all subsequent permanency review hearings.

[6] "Community Umbrella Agencies are part of a [Philadelphia] initiative known as Improving Outcomes for Children, led by [DHS]." TURNING POINTS FOR CHILDREN, https://turningpointsforchildren.phmc.org/about/become-a-foster-or-adoptive-parent/50-programs-available-for-families (last visited June 24, 2025).

(CUA). Exhibit 4 at 28. The juvenile court held additional permanency review hearings in October 2023, and January, April, July, September, and December 2024. Father appeared, for the first time, at the April 2024 hearing. The juvenile court ordered Father to submit to drug testing and permitted Father supervised visitation with Child. Additionally, the juvenile court ordered Father to undergo paternity testing, which subsequently established Father as the biological parent of Child. N.T., 1/7/25, at 50.

On October 23, 2024, DHS filed a petition to involuntarily terminate Father's parental rights, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). In its TPR petition, DHS alleged that Father "has failed to achieve full and continuous compliance with the established single case plan [(SCP)] objectives to facilitate reunification with [Child]." TPR Petition, 10/23/24, Exhibit A (Statement of Facts), ¶ w.

On January 7, 2025, the matter proceeded to a hearing. Father appeared, represented by counsel. Child did not appear, but was represented by counsel, who indicated there was no conflict between Child's best and legal interests. N.T., 1/7/25, at 19-20; *see also id.* at 20 (counsel indicating that Child, who was one year and nine months old at the time of the TPR hearing, was unable to articulate a position on DHS's request to terminate Father's parental rights). DHS presented the testimony of CUA caseworker Jacqueline Tillman (Ms. Tillman) and CUA outcome specialist Keira Nonemaker (Ms. Nonemaker). Father testified on his own behalf.

Ms. Tillman testified that, at the inception of the case, Mother advised DHS that Father was incarcerated. *Id.* at 29, 30-31. The juvenile court summarized Ms. Tillman's testimony concerning her first contact with Father, and Father's SCP objectives:

> According to Ms. Tillman, in the initial stages of the case, there were issues with locating Father in prison due to errors in the spelling of his name. *Id.* at 30-31, 49. Ms. Tillman testified she attempted to locate Father at the addresses [generated] by [] Parent Locator Services (PLS)[,] but no one knew Father at one residence and no one answered the door at the other residence. *Id.* at 50-51. Ms. Tillman testified that she spoke to Father for the first time at Father's first court appearance[,] which was at a hearing in April of 2024. *Id.* at 52. At the hearing in April 2024, Father's initial [SCP] objectives were explained to him as a condition of his reunification with [Child]. *Id.* at 51-53. Furthermore, Father's [SCP] objectives were explained to him at another hearing on September 30, 2024, and the [juvenile c]ourt instructed Father that reunification was dependent on Father staying in contact with Ms. Tillman. *Id.* at 51. Ms. Tillman testified Father's [SCP] objectives were to have supervised visits … with [Child], submit [to] three random drug screenings, provide proof of employment, and obtain adequate housing. *Id.* at 26.

Juvenile Court Opinion, 4/8/25, at 9-10 (citations modified).

Ms. Tillman explained that Father failed to visit Child in the five months between the April and September 2024 permanency review hearings. N.T., 1/7/25, at 54. Ms. Tillman testified that, following the September 2024 hearing, Father only visited Child on five of twelve scheduled visits. *Id. But see id.* at 34 (Ms. Tillman testifying that DHS had to cancel one visit because Child was ill). Ms. Tillman testified that, "ever since [Child] started having visits with [Father], it seems as though [Child's] behavior at [daycare] changed. Child has been suspended from [daycare]." *Id.* at 40; *see also id.*

at 41 (Ms. Tillman testifying that Child was suspended from daycare for "hitting the [other] kids and being very aggressive. Taking things from them. I heard he was grabbing, pulling kids by the legs."). Ms. Tillman opined that Child would not "experience any irreparable harm" if Father's parental rights were terminated. *Id.* at 42.

The juvenile court summarized Ms. Tillman's testimony concerning Father's communication with DHS:

> Ms. Tillman testified that Father would not contact her to confirm visits. N.T., 1/7/25, at 34. Ms. Tillman testified that on the one occasion when Father did reach out to cancel a visit, she explained to him that he should reach out [if] he [could] not attend visitation[,] so that [Child] would not be brought to the [DHS] office for no reason. *Id.* at 32. Ms. Tillman testified that following this conversation, Father failed to contact her to confirm visits. *Id.* at 34. ….
>
> Ms. Tillman testified there was difficulty keeping contact with Father because she was provided an incorrect [phone] number. *Id.* at 29-30. Ms. Tillman testified that when she was provided with Father's sister's [phone] number [and called her], there was no answer. *Id.* at 55-56. Ms. Tillman testified that between the hearing in September 2024 and the [TPR] hearing, Ms. Tillman only spoke to Father five times. *Id.* at 47. Ms. Tillman testified that Father called and texted her from several different [phone] numbers each time he contacted her. *Id.* Ms. Tillman testified that when Father did contact her, Father never asked about [Child] and how [Child] was doing. *Id.* at 48.

Juvenile Court Opinion, 4/8/25, at 10-11 (citations modified).

Concerning Father's substance abuse, Ms. Tillman testified that, on each of his three random drug tests, Father tested positive for illicit drugs. N.T., 1/7/25, at 36-37. Ms. Tillman explained that in September and November

2024, Father tested positive for marijuana, and in December 2024, Father tested positive for fentanyl. *Id.*

Regarding his housing, Ms. Tillman testified that Father provided her, at various points, with the separate addresses of Child's paternal grandmother and paternal grandfather, but he did not confirm at which home he resided. *Id.* at 26-27; *see also id.* at 57 (Ms. Tillman testifying that Father "doesn't have his own appropriate housing."). Ms. Tillman testified that she was able to evaluate paternal grandmother's home, which was appropriate aside from needing additional bedding for Child. *Id.* at 27, 61. Ms. Tillman explained that she was unable to evaluate paternal grandfather's home, as her availability did not allow time for an assessment. *Id.* at 60, 62.

According to Ms. Tillman, at the time of the TPR hearing, Father had failed to provide DHS with proof of employment. *Id.* at 28. Ms. Tillman testified that Father advised her that he was working for a temporary employment agency in September 2024, but lost that employment approximately a week later. *Id.* at 58.

Ms. Tillman testified that Child presently resides with foster parents; Child's ten-month-old biological cousin; and A.S.'s two children, who are two and three years old. *Id.* at 44, 45. Regarding Child's relationship with foster parents, Ms. Tillman testified that Child calls A.S. "Mom," and that there is a parent-child relationship between Child and J.P. *Id.* at 42-43. Ms. Tillman testified that foster parents provide stability and support to Child, and that "it

would really hurt" Child to be removed from foster parents' care. *Id.* at 44.

Ms. Tillman explained that there are other children in foster parents' household, "[s]o [Child is] with the other children constantly, going to daycare with them as well. … [Child is] very attached to the entire family." *Id.* (some paragraph breaks omitted; footnote added).

Ms. Nonemaker, who supervised "one or two" of Father's visits with Child, testified that she did not observe "anything in the visits that gave [her] cause for concern[.]" *Id.* at 71. Ms. Nonemaker explained, however, that on December 4, 2024,

> [a]fter one of the supervised visits, Father met a woman that was in the lobby[ of the DHS facility where the supervised visit occurred]. She was … slumped over in the chair, as if she was under the influence of drugs or alcohol. [Father] had to shake her to wake her up, and kind of assist her to get up and out of the door of the [DHS facility].

*Id.* at 72.

Finally, Father testified on his own behalf, which the juvenile court summarized as follows:

> Father testified that he was incarcerated from November [22] until December [18,] 2023. N.T., 1/7/25, at 81-82. Father testified he missed visits [with Child] due to court [appearances] and [meetings with his] parole [officer,] but failed to contact Ms. Tillman to inform her of these scheduling conflicts. *Id.* at 76. Father testified he [had worked] for a temporary [employment] agency for twelve days to earn $600 in July 2024. *Id.* at 77. However, Father testified that following this arrangement, he had to look for [other] employment. *Id.* Father testified he had a medical marijuana card at some point[,] but he was robbed. *Id.* at 78. Father testified that due to being robbed[,] and [a] lack of finances to obtain a new medical marijuana card, he could not provide CUA with the medical marijuana card. *Id.*

Juvenile Court Opinion, 4/8/25, at 13 (citations modified).

At the conclusion of the TPR hearing, the juvenile court terminated Father's parental rights to Child, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Father timely filed a notice of appeal and contemporaneous Pa.R.A.P. 1925(a)(2)(i) concise statement.[7] On April 8, 2025, the juvenile court filed a Rule 1925(a) opinion.

Father raises a single issue in his Pa.R.A.P. 2116 statement of questions involved:

> Did the [juvenile] court … abuse its discretion in terminating Father's parental rights by finding the testimony presented by [DHS] was sufficiently competent evidence supported by clear, direct, weighty and convincing facts?

Father's Brief at 5 (capitalization modified).

We observe, however, in the argument section of his brief, Father claims that the juvenile court "abused its discretion by … not allowing Father additional time to complete his [SCP] goals …." Father's Brief at 8 (capitalization modified). Father does not cite or discuss any individual subsection of Section 2511(a); rather, Father broadly argues the juvenile court failed to consider "whether [Father] has faced barriers that prevented

---

[7] In his concise statement, Father vaguely complained that "the trial court abused its discretion by involuntarily terminating Father's parental rights." Concise Statement, 2/6/25, at 1 (capitalization modified).

[him] from maintaining the parent-child relationship." *Id.* at 9 (quoting *In re*

*Adoption of L.A.K.*, 265 A.3d 580, 593 (Pa. 2021)).  According to Father,

> [t]he lack of support [from DHS] and the withholding of information [by DHS,] such as the fact that [Father] was entitled to make-up visits[,] as well as assistance with transportation to and from visits with [C]hild[,] are clearly examples of "barriers" the Supreme Court thinks must be avoided in order to ensure the parent-child relationship.

*Id.* at 11.

We review the termination of parental rights for an abuse of discretion.

*See In the Int. of K.T.*, 296 A.3d 1085, 1104 (Pa. 2023).  This standard

requires appellate courts to

> accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion.  Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As the Pennsylvania Supreme Court discussed in *In re: R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010), there are clear reasons for applying an abuse of discretion standard of review…. Unlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents.  [*Id.*] at 1190.  Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Interest of K.T.*, 324 A.3d 49, 56 (Pa. Super. 2024) (brackets omitted) (quoting *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012)); *see also In re Adoption of C.P.D.*, 324 A.3d 11, 24 (Pa. Super. 2024) ("[T]he trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact." (citation and brackets omitted)).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [Section] 2511(a). Only if the court determines that the parent's conduct warrants termination of his … parental rights does the court engage in the second part of the analysis pursuant to [Section] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Matter of Adoption of L.C.J.W.*, 311 A.3d 41, 48 (Pa. Super. 2024) (citation omitted). "The standard of 'clear and convincing' evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of C.S.*, 327 A.3d 222, 237 (Pa. Super. 2024) (quoting *In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*)). Finally, this Court need only agree with the trial court as

to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (citation omitted).

Instantly, we address Father's claim that the juvenile court did not adequately consider barriers to the parent-child relationship in terminating his rights pursuant to Section 2511(a)(1). Section 2511(a)(1) provides:

> **(a) General rule--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1).

To satisfy Section 2511(a)(1), the petitioner "must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Adoption of B.G.S.*, 245 A.3d 700, 706-07 (Pa. Super. 2021) (citation omitted); *see also In re Adoption of C.M.*, 255 A.3d 343, 364 n.12 (Pa. 2021) ("[Section 2511(a)(1)] does not require a settled purpose of relinquishing parental claim **and** refusal or failure to perform parental duties, but one or the other." (citation omitted; emphasis in original)).

The General Assembly's emphasis on the six months immediately preceding the filing of the petition indicates the timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592. However, even where a petitioner has established by clear and convincing evidence that a parent has failed to perform parental duties for the six months preceding the filing of a TPR petition, "the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances," warrants involuntary termination. *Id.* at 593 (citation and brackets omitted).

> Although "parental duties" is not defined in the Adoption Act,
>
> [o]ur courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in a child's life. **Fortitude is required, as a parent must act with "reasonable firmness" to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities**.

*Id.* at 592 (citations, some quotation marks, and brackets omitted; emphasis added).

Pertinently, concerning "barriers" to the preservation of a parent-child relationship, our Supreme Court has observed that

> [w]hat constitutes a "barrier" in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with

- 12 -

the circumstances of each case. In some instances, obstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure to maintain the parent-child relationship. In other instances, trial courts have found substance abuse, mental health issues, homelessness, joblessness, criminal charges, or a confluence of some or all of these issues created barriers to the maintenance of the parent-child relationship. **In all instances, the trial court considered the explanation offered by the parent when deciding whether termination of parental rights was warranted**.

*Id.* at 593 (citations omitted; emphasis added).

Instantly, the juvenile court considered and rejected Father's reasons for failing to maintain a parent-child relationship with Child:

Father [] testified at the [TPR] hearing and took little accountability for his failure to complete his [SCP] objectives. N.T., 1/7/25, at 81. … Th[e juvenile c]ourt found Ms. Tillman's testimony credible regarding Father's [lack of progress toward completing his SCP] objectives and his relationship with [Child]. *Id.* at 87. Father was incarcerated from November [] until December 2023[,] but did not appear in court until nine months following [Child's] adjudication of dependency. The [SCP] objectives were communicated to Father when he appeared in court in April 2024[,] and Father was aware of [Child's] involvement with CUA. Father was aware he had to comply with his [SCP] objectives and remain in contact with CUA to have a relationship with [Child].

The [juvenile c]ourt found that Father went nine months without attending visits, between April [] and September 2024, despite being offered visitation at the April 2024 hearing. Father did not indicate to the [juvenile c]ourt any reasons for not attending visits at that time. Father only attended five visits with [Child]. Father indicated he missed visits following the September 2024 hearing because he was attending court and meetings with his parole officer. However, for some reason, Father still did not communicate with Ms. Tillman regarding his failure to attend or confirm the visits. Father had every ability to see [Child] over those five months and for whatever reason[,] Father decided not

to see [Child]. The [juvenile c]ourt found this evidenced an intent by Father to abandon [C]hild over that time period.

Juvenile Court Opinion, 4/8/25, at 13-14 (citations modified; one paragraph break omitted; emphasis added).

The juvenile court's findings are supported by the record and its conclusion is free of legal error. *See Interest of K.T.*, 324 A.3d at 56. Although Father offered some explanations for missing visits with Child following the September 2024 hearing, that hearing took place approximately one month before DHS filed its TPR petition. Father offered no explanation for failing to take any steps to complete his SCP objectives, including regularly visiting Child, prior to the September 2024 hearing. *See L.A.K.*, 265 A.3d at 592 (emphasizing that "parental duties" "undoubtedly include[] communication and association."). Moreover, the juvenile court appropriately exercised its discretion when it rejected Father's self-serving explanations for missing visits with Child after the September 2024 hearing. *See C.P.D.*, 324 A.3d at 24. Accordingly, Father's sole issue merits no relief.[8]

_____

[8] As we agree with the juvenile court that termination is warranted with respect to Section 2511(a)(1), we need not consider whether termination was appropriate pursuant to Sections 2511(a)(2), (5), and (8). *See Int. of M.E.*, 283 A.3d at 830.

Additionally, Father does not challenge the juvenile court's analysis of Section 2511(b) in his statement of questions presented or argument section of his brief. Thus, Father has waived this issue. *See Interest of R.H.*, 320 A.3d 706, 716 (Pa. Super. 2024) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop
*(Footnote Continued Next Page)*

Decree affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>7/14/2025</u>

_____

the issue in any other meaningful fashion capable of review, that claim is waived." (citation and brackets omitted)); ***In re M.Z.T.M.W.***, 163 A.3d 462, 466 n.3 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority." (citation omitted)).

Even if Father had preserved a Section 2511(b) challenge, it would entitle him to no relief. The juvenile court found that "there is no parental bond between Father and [Child,]" and "that [Child] has a very strong parental bond with [foster parents]." Juvenile Court Opinion, 4/8/25, at 16. The juvenile court concluded that termination of Father's parental rights would not cause Child irreparable harm, and is in Child's best interest. ***Id.*** at 16-17. As the juvenile court's findings are supported by the record and its legal conclusion is sound, any challenge to the juvenile court's Section 2511(b) analysis would be meritless. ***See Interest of K.T.***, 324 A.3d at 56.

- 15 -